[Cite as *In re C.R.*, 2017-Ohio-2596.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

IN THE MATTER OF: : **O P I N I O N**

C.R., DELINQUENT CHILD :

CASE NOS. 2016-L-060
: and 2016-L-061

Appeals from the Lake County Court of Common Pleas, Juvenile Division, Case Nos. 2016 DL 00443 and 2016 DL 00181.

Judgments: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Karen A. Sheppert*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Charles R. Grieshammer*, Lake County Public Defender, and *Vanessa R. Clapp*, Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} This consolidated appeal arises from two separate cases. Appellant, C.R, appeals his adjudication as a delinquent for committing kidnapping and assault. He also appeals his delinquency adjudication for committing burglary. The cases were tried separately. For the following reasons, we affirm each.

**{¶2}** We separately address the facts and assigned errors from each appeal.

**Appellate Case No. 2016-L-060 arising from Trial Case No. 2016DL00443**

**{¶3}** In his first appeal, appellant challenges his delinquency finding as not supported by sufficient evidence and against the manifest weight of the evidence. His assigned errors assert:

**{¶4}** "The trial court erred to the prejudice of the delinquent child-appellant when it denied his Crim.R. 29(A) motion for judgment of acquittal, in violation of his rights to fair trial and due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

**{¶5}** "The trial court erred to the prejudice of the juvenile when it returned a verdict of true against the manifest weight of the evidence."

**{¶6}** Crim.R. 29(A) states: "The court * * * shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." If a juvenile denies the delinquency allegations "the court shall * * * determine the issues of proof beyond a reasonable doubt." Juv.R. 29(E)(4).

**{¶7}** Whether evidence is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). "Raising the question of whether the evidence is legally sufficient to support the * * * verdict as a matter of law invokes a due process concern. *State v. Thompkins* * * *. In reviewing such a challenge, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

2

crime proven beyond a reasonable doubt.' *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶113.

{¶8} Unlike a sufficiency of the evidence argument, a challenge on manifest weight of the evidence grounds concerns "'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*' (Emphasis added.) *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶9} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ' "thirteenth *** juror" ' and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs [v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211.] See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721 ('The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')" *Thompkins*, at 387.

3

**{¶10}** The fact that the evidence is susceptible to more than one interpretation does not render a conviction against the manifest weight of the evidence. *State v. Ramey*, 2d Dist. Clark No. 24-CA-127, 2015-Ohio-5389, 55 N.E.3d 542, ¶50, appeal not allowed, 145 Ohio St.3d 1458, 2016-Ohio-2807. "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *Id.* at ¶51.

**{¶11}** Appellant was charged with two counts of kidnapping and two counts of assault. Following trial, one charge of kidnapping was found to be true and both assault charges were found true. Appellant does not take issue with the assault charges. He collectively argues that his kidnapping finding of true was not supported by sufficient evidence and was against the manifest weight of the evidence. Specifically, he avers the state failed to establish that he was under circumstances creating a substantial risk of serious physical harm and that it did not prove that the victim's liberty was restrained.

**{¶12}** Appellant was found true of violating R.C. 2905.01(B)(2), which states:

**{¶13}** "(B) No person, by force, threat, or deception, * * * shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim or, in the case of a minor victim, under circumstances that either create a substantial risk of serious physical harm to the victim or cause physical harm to the victim:

**{¶14}** "* * *

**{¶15}** "(2) Restrain another of the other person's liberty."

**{¶16}** Appellant claims he was engaged in a fist fight that was a mutual exchange between himself and "T.T." He asserts he did not restrain T.T. against his

4

liberty.

{¶17} Appellant was fifteen years old at the time of trial. The victim of the offenses, T.T., testified for the state that he had been appellant's friend for a few years before the incident. On that day, T.T. was with appellant and other friends at a friend's house when they left and went to appellant's home later that night. T.T. recalled that it was after Christmas, but before New Year's Day. While still at the first location, appellant accused T.T. and a few others of taking his money.

{¶18} After arriving at appellant's home, the juveniles were in appellant's bedroom looking for clothes, when appellant again began accusing T.T. of taking his money. The bedroom door was open. About three other kids were in the room at the time. Then T.T. recalls the two began fighting. They stopped fighting for a short while and then appellant began searching T.T. When asked why he did not leave, T.T. said "[b]ecause I wanted to prove to him that I didn't have [his money] * * *."

{¶19} T.T. explains he took off his clothes as directed by appellant to demonstrate that he did not have his money. T.T. recalls appellant hitting him with a curtain rod and punching him while appellant ordered him to take off his clothes. T.T. confirmed that he did not want to take off his clothes, but that he did what appellant told him to do.

{¶20} Two video clips were played at trial, and T.T. confirmed that the videos accurately depict the events and that appellant was wearing black, and T.T. was wearing a white hoodie and gray jogging pants.

{¶21} The first video clip depicts appellant cornering T.T. in a bedroom. The aggressor is dressed in black and is wearing red and white tennis shoes. T.T. leans

5

forward as if to try to leave the room, and an individual, identified at trial as appellant, then shoves T.T. back into the corner and partially picks him up and drops him on the ground. Appellant then punches T.T. in his head multiple times and stomps on T.T.'s legs, back, and head. Throughout this clip, you can hear someone asking for money and calling T.T. derogatory names.

{¶22} The second video clip depicts appellant holding a curtain rod and directing T.T. to take off his clothes. T.T. is standing in front of a closet. T.T. asks if they are going to rape him, and a voice says he is looking for his money. Appellant directs T.T. to remove his shirt and pants. At one point T.T. hesitates, and appellant strikes him with the curtain rod. T.T. is seen cowering to avoid injury. Appellant then commands T.T. to get dressed. The video depicts that T.T. was not free to leave and that he complied with the orders to both undress and redress.

{¶23} T.T.'s mother Talia Taylor testified that her son often ran away from home. She was working in early January 2016, when she asked T.T.'s friend's mom if she had seen T.T. The woman told Talia that T.T. had been staying at appellant's house. Talia called appellant's mother and informed her that T.T. had a warrant for his arrest for skipping school.

{¶24} A few weeks later someone knocked on Talia's door and showed her two videos of her son from Facebook. She used her phone to record them as they were being played on the other person's phone. Talia shared the videos with police and confirmed that the ones shown at trial were those she recorded.

6

**{¶25}** Appellant alleges there was insufficient evidence that T.T.'s liberty was restrained under circumstances showing he was at a substantial risk of serious physical harm. We disagree.

**{¶26}** "The term 'substantial risk' is defined as ' * * * a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist.' R.C. 2901.01(A)(8). The term 'physical harm' is defined as ' * * * any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3) Finally, 'serious physical harm' is defined, in R.C. 2901.01(A)(5), as any of the following:

**{¶27}** "'(a) Any mental illness or condition or such gravity as would normally require hospitalization or prolonged psychiatric treatment;

**{¶28}** "'(b) Any physical harm that carries a substantial risk of death;

**{¶29}** "'(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

**{¶30}** "'(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, substantial disfigurement;

**{¶31}** "'(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.'" *State v. Vinson*, 5th Dist. Stark No. 2003CA00132, 2004-Ohio-1568, ¶21-26.

**{¶32}** The videos depict that T.T. was not free to leave and that he was under threat of serious physical harm. The first clip shows T.T. make an effort to leave, but appellant responded by shoving him in the corner. Immediately thereafter, appellant picks up T.T. and drops him on the ground. Then appellant punches T.T. in his head

multiple times and stomps on his head, back, and legs with all of his strength. The second clip shows appellant ordering T.T. to take off his clothes. Upon T.T. showing reluctance to remove his shirt, appellant strikes him with a curtain rod. Appellant then orders T.T. to put his clothes back on while holding a metal rod over him. The video does not show mutual combat as appellant claims, but T.T. is seen simply trying to cover and defend himself from appellant's blows. In addition, had T.T. not cowered down and covered his head, he would have been struck in the face by the rod. Contrary to appellant's argument, T.T. was not a willing participant in mutual combat who was free to leave.

{¶33} Thus, the evidence establishes that T.T.'s liberty was restrained under circumstances depicting that he was under a substantial risk of serious physical harm. Accordingly, appellant's kidnapping finding of true is supported by sufficient evidence and is not against the manifest weight of the evidence, and appellant's first and second assigned errors lack merit.

{¶34} The judgment of the Lake County Court of Common Pleas, Juvenile Divison, is affirmed.

**Case No. 2016-L-061 arising from Trial Court No. 2016DL00181**

{¶35} In his second appeal, appellant raises two assigned errors from his delinquency determination arising from the burglary of a home in Painesville, Ohio. His assigned errors allege:

{¶36} "The trial court erred to the prejudice of the delinquent child-appellant when it denied his Crim.R. 29(A) motion for judgment of acquittal, in violation of his rights to fair trial and due process as guaranteed by the Fifth and Fourteenth

8

Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

{¶37} "The trial court erred to the prejudice of the juvenile when it returned a verdict of true against the manifest weight of the evidence."

{¶38} Appellant was charged as a delinquent child for committing burglary in violation of R.C. 2911.12(A)(1), which states:

{¶39} "No person, by force, stealth, or deception, shall do any of the following:

{¶40} "(1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense * * *."

{¶41} Appellant first argues there was insufficient evidence to support his delinquency adjudication for committing burglary because there was no reliable evidence placing him in or at the home at the time of the burglary. He claims this is a case of misidentification and the fact that he knocked on the door of the burglarized residence 45 minutes before the burglary was insufficient to establish he subsequently entered the home and committed a theft inside. For the following reasons, we disagree.

{¶42} On the afternoon of January 12, 2016, Sabrina Giordino, 20 years old, was home with her infant daughter and grandfather, Joseph Giordino. Sabrina answered her front door, and it was appellant asking if her brother was home. Sabrina knew appellant since he had been friends with her brother for years. She did not see anyone else with him. Sabrina told appellant that her brother was in school. She then

9

closed and locked the front door, but she did not deadbolt it. She went back upstairs with her daughter and grandfather.

{¶43} Approximately 45 minutes later, Sabrina heard a "huge bang" from downstairs. All three residents were still upstairs. She recalls quickly running downstairs with her daughter in her arms and seeing the flat screen television missing from her mom's room. She called the police and then noticed that the Xbox One, its controllers, and a videogame were missing from their living room. Sabrina believes the loud noise was the television being pulled out. She testified that the stolen television was 72 inches and that it was so big that two people were needed to move it.

{¶44} She also said that the front and back doors were open. Sabrina described the backdoor as wide open, and she later saw a footprint on it. She recalls her front door was hanging open and that the wood on it was splintered as a result. Sabrina did not see anyone in her home or running away from it at the time, but her grandfather said he saw appellant. Sabrina testified:

{¶45} "I heard a big, huge bang. I quickly moved. I get to the stairs. My grandpa's surprised. I said 'Grandpa, what was that?' * * *

{¶46} "* * *

{¶47} "In a surprised looking way he was like, 'Is it Nick in your mother's room? His friend was standing by the door.'

{¶48} "* * *

{¶49} "Did he indicate which friend?

{¶50} "He said, 'Tanky [appellant's nickname].'"

10

**{¶51}** Sabrina explained that her grandfather Joseph was very sick at the time of trial and unable to attend. However, she said at the time of the break-in he was able to move well:

**{¶52}** "Q. Was he able to go up and down stairs quickly?

**{¶53}** "A. Yes. Around that time yes, he moved (inaudible) say quickly. Now, no, can't barely move."

**{¶54}** However, Sabrina's mom, Nicole Giordano, referred to Joseph as sick at the time of the break-in, but Nicole was not asked about his location or mobility at the time of the break-in. Nicole explained that her father was unable to attend the trial because he was very sick and had just been released from the hospital one week before.

**{¶55}** Nicole recalls Sabrina calling her at about 1 p.m. to tell her about the break-in. She was at work at the time. Nicole said the stolen television was a 42-inch flat screen, not a 72-inch television. She also confirmed that appellant had been friends with her son for some time before the incident.

**{¶56}** Nicole called appellant's mom the day of the burglary to try to get her property back. She spoke with appellant's mom on the phone and she later texted her as well. Appellant's mom responded in a text message that appellant was there, but said he did not take their stuff, and he refused to snitch on who did.

**{¶57}** Nicole's son and Sabrina's brother, N.G., also testified. He was fourteen years old and in eighth grade at the time of trial. N.G. described being friends with appellant for at least five years at the time of the break-in, and N.G. agreed that appellant had been to his home numerous times.

{¶58} N.G. was not home when his home was broken into. However, he met appellant at a convenience store soon after his home was burglarized, and appellant swore to him that he did not take N.G.'s family's things. He did tell N.G. that he was there when another juvenile, "T.T.," took his stuff, but appellant told N.G. he did not enter the home. N.G. confirmed that T.T. texted him the day of the burglary to see if he was home.

{¶59} A neighbor, Shelly Dubois, also testified. She lives across the street and three houses away. She described the houses on the street as close together. Dubois was outside with her dog when she saw two black juveniles at the Giordano house. One was at the front door and another was around back. She recalls the one at the front door was wearing a red hoodie. Upon being shown a photo lineup, approximately one month later, Dubois identified appellant as the boy in the red hoodie. On cross-examination, she agreed that she was not certain as to his identity but said,

{¶60} "I'm pretty sure it was him, but I'm not 100 percent. It was far away and it was two boys. * * * I don't even know who the other, first boy was. I didn't even glance and I didn't stare over there. I just - - he just looks very familiar and all I saw him do was knock on the door and then go in the back. I didn't see anything else." She never saw the boys enter or exit the home.

{¶61} At trial Dubois could not say whether appellant was the boy she saw that day, but she agreed that her identification of him in the photo lineup was five on a scale of one to ten at the time it was made.

{¶62} Detective Jason Hughes of the Painesville Police Department prepared the photo lineups shown to Dubois and to Sabrina's grandpa, Joseph. Hughes agreed

that the photos used in both photo arrays were low quality. Hughes testified that Joseph was unable to make a positive identification from the lineup, but recalls him saying that one photo "may be the guy who broke in." The photo that Joseph referenced did not depict appellant. Joseph was hospitalized at the time he was shown the lineup.

{¶63} Contrary to appellant's argument, appellant was seen by two individuals at the home just prior to the offense, and was also seen at the home at the time of the offense. Moreover, appellant admitted to being present at the time of the burglary to N.G. The foregoing allows a rational trier of fact to find the essential elements of burglary proven beyond a reasonable doubt, and as such, this assigned error lacks merit.

{¶64} Appellant likewise avers his conviction was against the manifest weight of the evidence and alleges the trial court clearly lost its way by relying on Joseph's testimony even though he lacked mobility and in light of the inconsistent testimony as to the dimensions of the stolen television. We disagree.

{¶65} Appellant does not challenge the admissibility of Joseph's hearsay statement on appeal. Instead, he avers that Joseph's statement placing appellant inside the residence is unreliable. Appellant claims the Joseph was sick at the time and unable to move and that had appellant really been in the home, then Sabrina surely would have seen him.

{¶66} Although Nicole described her father as "sick" at the time of the burglary, neither she nor Sabrina testified that he lacked mobility at the time. Instead, Sabrina testified that he was able to go up and down stairs quickly at the time of the offense, but

13

that he could barely get out of bed at the time of trial. Thus, we disagree with appellant's argument.

{¶67} As appellant contends, Sabrina described the missing television as a 72-inch flat screen that would require two people to carry it. However, her mom testified that it was a 42-inch flat screen. Sabrina also initially testified that the burglary occurred at 4:30 p.m., but she later described it as occurring at 12:45 p.m. Regardless of Sabrina's uncertainty of the time of the offense and the discrepancy as to the size of the stolen television, these inconsistencies were before the trial court and it was in the best position to weigh the evidence and determine the witnesses' credibility. Contrary to appellant's arguments, this is not an exceptional case in which the evidence weighs heavily against the trial court's decision. Thus, the trial court's decision is not against the manifest weight of the evidence, and as such, appellant's assigned error lacks merit.

{¶68} The judgment of the Lake County Court of Common Pleas, Juvenile Divison, is affirmed.


CYNTHIA WESTCOTT RICE, P.J.,

COLLEEN MARY O'TOOLE, J.,

concur.